United States District Court
Northern District of Texas

Jeremy Pinson,
    Plaintiff,
v.
Jose Santana,
Catricia Howard,
Charles Samuels Jr.,
Federal Bureau of Prisons,
    Defendants

Case No. 13-CV-2098-D

ORIGINAL

## SECOND AMENDED COMPLAINT

### I. Jurisdiction:

1. Jurisdiction is asserted pursuant to 28 U.S.C. 1331, 1332, 1361 and 2201-02, as well as Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1972).

### II. Parties:

1. Plaintiff Jeremy Pinson is an inmate in the custody of the defendant Federal Bureau of Prisons. (hereinafter "BOP").
2. Defendant Jose Santana is the Chief of the BOP Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas.
3. Defendant Catricia Howard is a designator at the DSCC.
4. Defendant Charles Samuels Jr. is the Director of the BOP.
5. Defendant BOP is a federal agency that operates prisons throughout the United States.

1

## III. Statement of Facts:

Plaintiff has seperated the facts into seperate categories for the convenience of the Court.

### A. History of Incarceration

1. In 2006, In the Western District of Oklahoma plaintiff was indicted for threatening the President of the United States in a letter while serving a 3-year embezzlement sentence in the Oklahoma Dept. of Corrections.

2. Suspecting a mental disease the parties stipulated to a mental evaluation to determine competency to stand trial which BOP conducted at the Federal Correctional Institute in Fort Worth, Texas.

3. The evaluation determined Pinson was competent, but mentally ill and strongly suggested Pinson be treated in a structured program while incarcerated.

4. Pinson was convicted and sentenced to 240 months in prison. Following lengthy testimony by a renowned psychologist the sentencing court recommended BOP house Pinson at Federal Medical Center, Butner, North Carolina for treatment.

5. The BOP ignored the recommendation and sent Pinson to the Beaumont United States Penitentiary, a maximum security facility infamously known as "bloody Beaumont" for the rampant violence.

6. Pinson received no consistent mental health treatment at Beaumont and was transferred to the Florence U.S. Penitentiary in October 2007.

2

7. After 2 weeks in general population an inmate handed Pinson a shank and told Pinson to "hold it". New inmates are routinely targeted to hold contraband. Pinson gave the weapon to a correctional officer immediately and instead of receiving praise Pinson was sent to segregation and issued an disciplinary report.

8. Pinson was ineligible for mental health programs in SHU and was transferred to USP Victorville in February 2008.

9. On April 9, 2008, Pinson was brutally attacked by fellow inmates (See: Pinson v. Prieto, No. 10-cv-811 C.D.Cal., Report and Recommendation dated 9/30/14). Pinson was returned to the SHU.

10. Pinson received virtually no mental health treatment at USP Victorville and on May 29, 2008 was sent to FDC Houston to face an indictment in United States v. Pinson, No. 08-CR-283 (S.D.Texas).

11. Staff at FDC Houston immediately housed Pinson in SHU where Pinson was ineligible for mental health programs.

12. Pinson pled guilty. At sentencing Judge Lee H. Rosenthal took the extraordinary step of requiring BOP staff and attorneys to be present so she could recommend in the Judgment document and to their faces that the BOP stop housing Pinson in segregation or solitary confinement and numerous recommendations about mental healthcare. The BOP officials promised to review them.

13. Instead of following the recommendations, BOP sent Pinson to the Coleman U.S. Penitentiary. Pinson was sent to the SHU because staff had "lost" Pinson's Central File, in January 2009.

14. Pinson received no mental health treatment at USP Coleman and was transferred to the Talladega Special Management Unit in August 2009.

15. Pinson received no mental health treatment at SMU Talladega and was sent to ADX Florence in February 2011.

B. <u>Medical and Mental Health History</u>

1. In 1992 Pinson received a traumatic head injury that resulted in the development of a siezure disorder.

2. The number of siezures a month fluctuates. Often Pinson has 2 per week. When a siezure occurs, Pinson loses consciousness, convulses, cannot breathe, loses continence and often receives injures from them either because of falling and striking the head or striking surroundings while convulsing.

3. As recently as Oct. 31, 2014 Pinson received a concussion due to a siezure.

4. Pinson's siezure disorder requires Pinson to be frequently evaluated by a physician to monitor medications, frequent laboratory blood tests to monitor medication levels and possible injury to the liver, and that Pinson not be left alone for extended periods.

5. Pinson is also seriously mentally ill and has been into inpatient hospitals since age 11.

4

6. Pinson suffers from Gender Dysphoria, Schizoaffective Disorder - Bipolar Type, and Autism Spectrum Disorder. These conditions require medication and regular psychotherapy.
7. Additionally the Standard of Care for Gender Dysphoria is known as triadic therapy (see: www.wpath.org) which involves hormone therapy and living as the preferred gender.
8. Pinson's mental health issues were communicated to the BOP by two sentencing courts. See: United States v. Pinson, 542 F.3d 822 (10th Cir. 2008); United States v. Pinson, No. 08-CR-283 (S.D.Tex., "Judgment in a Criminal Case, Section: Recommendations").
9. Pinson's mental health issues were communicated in letters and phone calls to the BOP by Pinson's Federal Public Defenders, Pinson's Mother and friends as well as others.

C. Transfer to ADX

1. In July 2010 the Warden of SMU Talladega initiated a request to transfer Pinson to the ADX. This was done via a written request to the DSCC.
2. A transfer to ADX is multilevel process. Following a Warden's request BOP policy requires the prisoner be medically and psychologically evaluated for clearance. Following this a hearing administrator conducts a hearing and submits written recommendations to the BOP Assistant Director for Correctional Programs and D.S.C.C. Chief for a decision. The final decision is signed by the Assistant Director and delivered to the inmate.

3. The SMU Warden initially wanted to send Pinson to the ADX Control Unit however because there was not consensus to do this, the plan changed to send Pinson to the ADX General Population (which is distinguishable in name only).

4. In the interim of July and December 2010 defendant Howard was tasked with gathering all relevant records for the ADX referral hearing. She received and reviewed Pinson's Central file, Medical, Psychology and Psychiatric records and reviewed the same. Howard was fully aware of Pinson's medical and mental health issues as well as the conditions at ADX.

5. In December 2010 having received Howard's investigative input, hearing administrator Lee Green conducted a hearing by telephone but because Pinson wished to submit documentary evidence and witness statements, the hearing was postponed a week.

6. At the hearing Pinson presented a lengthy statement as well as witness statements that rebutted the allegations of the ADX referral. Among other things the evidence raised serious concerns that ADX was not equipped to care for Pinson's medical and mental health conditions.

7. Pinson had not received a physical or mental exam prior to the hearing and did not receive one after. To further circumvent BOP policy the SMU Warden provided a materially false memo from a nurse (as opposed to a doctor as required) stating Pinson had no medical or mental health issues.

8. Pinson's objections to the falsification of documents regarding medical/mental health conditions were in writing and supported by numerous exhibits showing prior and current diagnoses.
9. The hearing administrator recommended placement at ADX, and submitted all of Pinson's statements and evidence to Samuels (then the Assistant Director) and Santana.
10. Pinson was approved by Samuels and Santana and within days was moved to the USP Atlanta SHU en route to ADX.
11. While at USP Atlanta, Pinson's treating doctor sexually abused Pinson. The doctor, hired by BOP while out on bail from charges of sexual abuse at a prior jail in Washington D.C., was later convicted and sentenced to a BOP prison term.
12. Due to the sexual assault, 3108 days in segregation or solitary confinement and virtually no mental health care since 2003 Pinson was deeply disturbed by the time Pinson arrived to ADX in 2011 on February 25th.

D. Conditions/Practices at the ADX

1. The ADX is infamous because of its conditions and its residents. The Unabomber, Eric Rudolph, Terry Nichols and Thomas Silverstein are there. It is known to every inmate and staff member in the BOP.
2. Charles Samuels has visited the ADX. He has toured it and is aware of its mission and conditions.
3. Because of its mission, Santana and Howard were trained and informed by BOP of the conditions at the ADX for designation purposes.

7

4. At any given time, between 400 and 500 inmates are housed at ADX in nine different maximum-security housing units.

5. Inmates at ADX spend 22 to 24 hours a day in their cells. The cells measure approximately 12 feet by 7 feet, and have solid walls that prevent prisoners from viewing the interiors of other cells or having direct contact with prisoners in adjacent cells. All ADX cells have solid doors with a small closable slot. Cells have an interior barred wall with a sliding door, which together with the exterior door forms a sally port in each cell.

6. Each cell was furnished with a concrete bed, desk and stool and a stainless steel combination sink and toilet. The cells include a shower with an automatic shutoff valve. The beds were dressed with a thin mattress and blankets over the concrete. Each cell contains a single window, 42 inches tall and 4 inches wide, which allows entry of natural light but which is designed to ensure prisoners cannot see anything but sides of buildings and sky.

7. Meals are delivered 3 times a day. Prisoners were only allowed out of their cells for social or legal visits in a solid glass booth, some medical treatment, the "law library" which was a cell containing a limited LEXIS NEXIS program and a few hours of recreation. Otherwise we stayed locked in our cells.

8. Assaults and stabbings were common. In 2005, two ADX prisoners slowly beat and stomped a third prisoner to death over a period of many minutes in full view of staff who made no effort to intervene until the victim was still lying in a pool of blood.

8

9. More recently prisoners were seriously stabbed at ADX in Nov. 2011, Sept. 2012 and April 2013. Pinson a mentally-ill victim of past assaults was deeply impacted by the violence.

10. In all units at ADX, the BOP made a determined and calculated effort to dominate prisoners through the use of punitive techniques that included the use of extended periods of isolation, withholding of privileges (access to the telephone, incoming mail, etc.).

11. ADX programs were designed based upon a punishment philosophy not a control philosophy. The behavior of mentally ill prisoners, in particular, deteriorates very rapidly when they are placed into programs designed to punish rather than control unacceptable behaviors.

12. BOP permitted the correctional staff, as part of its punishment-focused model, to use physical abuse of unruly or merely assertive prisoners to create fear and to demonstrate the dominance of the staff. Staff routinely withheld meals, threw incoming mail into the trash, used physical force or chemical agents upon inmates, refused medical treatment, etc. - all in an effort to instill fear and punish ADX inmates.

13. The conditions at ADX were protested, directly, to defendants Samuels and Santana, in letters from inmates, their families and members of Congress. Moreover they were sent damning reports by the ACLU, National Religious Campaign Against Torture, Amnesty International and others condemning the ADX.

14. The history of solitary confinement is full of scientific proof of its harmful effects.

15. As early as the 1960s, the electroencephalography examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week.

16. A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions.

17. Similarly, a 2011 study showed that after only a week of solitary, prisoners showed decreased EEG activity.

18. The BOP, and presumably its chief administrators (Samuels and Santana), has known since 1999 that extended periods of confinement in isolation can be psychologically damaging to any prisoner and can be particularly harmful to individuals with pre-existing mental illnesses. Specifically, a 1999 study by the National Institute of Corrections (component of the BOP) concluded:

> "Insofar as possible, mentally ill inmates should be excluded from extended control facilities. Each inmate being considered for such a facility should have a mental health evaluation. Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproductive, for this population."

19. BOP Policy implicitly prohibited Pinson's placement at the ADX. See: 28 C.F.R. 541.41(c) and 541.46(i).

20. Many prisoners at ADX were completely insane. They routinely smeared themselves and their cells with feces. To spread the misery plaintiff was rotated into cells following it being caked or contaminated with feces, blood, urine or unknown substances often by prisoners known to have Hepatitis. Some prisoners howled or shrieked continuously. Many banged on their cell bars, or their showers, day and night, talking to themselves, wailing and screaming, and otherwise expressing their indeterminate suffering to the great disruption and discomfort to plaintiff.

21. The conditions at ADX, were shared by inmates and lawyers, activists, etc. With the DOJ Inspector General who commonly referred the complaints to the BOP's Chief of Internal Affairs John Dignam for investigation. Mr. Dignam in consultation and collaboration with Mr. Samuels approved of and continued a practice throughout BOP of allowing institutions to investigate complaints against themselves. As a result, ADX was tasked with investigating all complaints against ADX then sending the results to Dignam, Samuels and others to decide.

22. Additionally because of legal action by the Plaintiff, and other factors, Samuels in 2012 and 2013 was summoned to testify before the U.S. Senate Judiciary Committee and was repeatedly asked about the deleterious effect of solitary at ADX on the mentally ill.

11

23. The plaintiff received no mental health programming at ADX in a structured program, no treatment whatsoever for gender dysphoria which some ADX doctors called "fag-itis", was prescribed medications which due to no on-site psychiatrist were not monitored and either expired without renewal or caused serious adverse side effects (vomiting and tardive dyskinesia). The ADX was not designed or equipped to treat the mentally ill.

E. Effects Upon Plaintiff

1. The plaintiff began to unravel soon after arriving to the ADX with increasing symptoms of psychiatric distress including depression, anxiety, suicidal ideation, irritability, mood swings.

2. The plaintiff required psychiatric intervention, but most of the time received no substantive help from onsite doctors who claimed to be overworked, understaffed and not equipped to deal with Pinson's issues.

3. Pinson attempted or actually harmed Pinson several times, including two serious suicide attempts that required outside hospitalization (once in the ICU).

4. Samuels, Santana and Howard were aware of Pinson's condition because of the intense media, congressional and judicial scrutiny and inquiries. Still they took no action to remove Pinson from ADX or provide mental health treatment.

5. In August 2014, BOP invited outside experts (a psychologist and psychiatrist) to independently diagnose and examine Pinson. Pinson was determined to be actively psychotic, schizoaffective, autistic and gender dysphoric.

6. Doctors invoked their authority to transfer Pinson on an urgent basis to a medical facility. However contrary to therapeutic needs, Samuels and Santana sent the plaintiff to a medical facility and housed Pinson still in solitary confinement, reduced access to outdoor recreation and imposed a "Lieutenant Hold" that bars Pinson from meaningful access to a law library, medical care, a shower, etc.

7. Pinson's mental state in solitary confinement continues to deteriorate. Pinson is in Major Depression, thinks of suicide often, and speaks to another human on average 5-15 minutes a week in total. Pinson is in total social isolation and experiences depression, anxiety, inability to concentrate, difficulty speaking, and more.

8. Additionally Pinson has sustained serious injuries in isolation from untreated epileptic siezures including a series of concussions, lacerated tongue, broken tooth, lacerations, bruises, headaches.

## F. The Campaign of Retaliation

1. Pinson is a highly disfavored prisoner within the BOP because Pinson is litigious and frequently embarrasses the BOP.

2. When Pinson arrived to SMU Talladega Pinson set out to undo the creation of the units and expose the BOP's incitement of prisoner on prisoner violence.

3. First, Pinson caused the ACLU of Alabama to initiate an investigation into SMU conditions. This was later picked up on a national basis by the Center For Constitutional Rights, ACLU National Prison Project, Lewisburg Prison Project, and Washington Lawyers Cmte. For Civil Rights and Urban Affairs.

4. Second, Pinson filed a lawsuit with dozens of other inmates that is still in litigation against Samuels among others. See: Pinson v. Samuels, No. 10-5059 (D.C. Cir.).

5. Third, Pinson helped draft numerous other lawsuits for SMU prisoners inundating the BOP with challenges to its practices in federal court.

6. Fourth, Pinson took to the internet via a volunteer and constantly recruited activists to lobby members of Congress about the activities of Samuels and Howard and Santana in creating and expanding the SMU's.

7. Fifth, Pinson laid siege to the BOP through journalists willing to honestly report on abuse resulting in international press attention on CNN, MSNBC, in The Atlantic, The New York Times, The Washington Post, etc. all condemning the BOP's practices through law firms and other parties.

8. Samuels and other officials throughout the BOP were keenly aware of Pinson's activities, it was impossible to ignore given the inundation of letters, calls, press inquiries, congressional hearings, lawsuits, etc.

9. Prior to going to the ADX multiple BOP officials involved in the process bragged that Pinson was being sent there to be "broken" and many other profane terms. This included Captains, Assistant Wardens, Warden, and 2 high ranking regional officials. All were unanimous that the chief motivation for this was anger at all the attention and work Pinson had brought to the BOP. Everyone was unanimous that Samuels, Howard and Santana were involved and "on board".

10. Once Pinson was at the ADX and had met the 1 year good conduct threshold to transition out, Pinson was denied every 6 months for years with no official specific reason given. Every staff member asked to provide a reason pointed to Samuels' animus towards Pinson.

11. After being placed in solitary in Oct. 2014 at Springfield Medical Center again several staff cited Pinson "litigiousness" as the sole basis for animus towards Pinson. Staff further cannot cite to a reason Pinson remains in solitary, only a name = Samuels.

12. One staff member in the SMU, Greg Smith, wrote a false report alleging Pinson stabbed Smith knowing it to be untrue. An FBI investigation concluded Pinson had not stabbed Smith. Samuels however cited Pinson's stabbing Smith as grounds to send Pinson to ADX, and to keep Pinson in solitary now.

13. Based upon the aforegoing, Plaintiffs placement at ADX and continued housing at ADX, was a product of Samuels' instruction.

15

## G. The BOP's Care Level System

1. The BOP seperately classifies prisoners medical and mental healthcare needs on as system known as "care levels".

2. The lowest care level is 1 for prisoners with minimal needs. The highest is level 4 for prisoners with acute needs requiring hospitalization level monitoring.

3. Prisoners with serious medical or mental health needs, which are chronic, are classified as Care Level 3.

4. BOP facilities are categorized by Care Level based upon staffing levels, location and proximity to an outside hospital, access to specialized care, training and other factors.

5. At the time of Pinson's transfer to ADX the BOP only operated 3 Care Level 3 penitentiaries, one in Tucson, AZ; Terre Haute, IN; and Allenwood, PA.

6. ADX is a Care Level 2 facility. It lacked a permanent medical doctor, psychiatrist or nursing staff. If any medical issue occurred after 5 p.m. no emergency qualified personnel were available. It's only practitioner was an African emigre' trained in the former Soviet Union named Anthony Osagie who lacked credentials from and state Medical Board in the United States.

7. As prisoners are designated to facilities, including ADX, BOP policy requires the designating officials to review the requisite care levels of the prisoner and the facility to ensure consistency and to extensively review the medical and mental health records of ADX referrals.

16

8. The officials responsible for reviewing Pinson's medical and mental health history and care levels to determine the appropriateness of ADX were Catricia Howard, Charles Samuels and Jose Santana, among others.

9. Pinsons medical and mental health needs exceeded the resources and facilities of ADX. Samuels, Santana and Howard knew this and an extended debate of several months between them and other BOP officials occurred on whether to send Pinson to ADX. Prior ADX referrals had been denied, by others, because of Pinson's inappropriateness for ADX.

10. At multiple hearings on the ADX referral, regional official Lee Green told Pinson "everyone involved knows this may kill you, that's kinda the point." Green was in regular contact with Samuels, Howard and Santana in the decisionmaking process by phone, email and otherwise.

11. To make Pinson's ADX transfer, in essence look good on paper, BOP officials artificially lowered Pinson's care levels to 2 to match ADX.

12. When Dr. Jennifer Coulter raised Pinson's care level to 3 at the ADX, Samuels and Santana ordered Coulter to reduce it to 2 and terminate Pinson's transfer to the Terre Haute facility and Pinson was told they would allow the transfer only when Pinson terminated all lawsuits and ceased contact with representatives of the news media.

IV- Recitation of Claims

Claim One: Subclaim A - Violation of 8th Amendment - Deliberate indifference by placing plaintiff, a mentally ill inmate, at ADX in those conditions; (Samuels, Howard, Santana);
Subclaim B - Violation of 8th Amendment - Deliberate indifference by failing to adequately treat plaintiffs mental illness at ADX; (Samuels, Santana);
Subclaim C - Violation of 8th Amendment - Deliberate Indifference for failure to train, supervise, discipline ADX personnel (Samuels, BOP);
Subclaim D - Violation of 8th Amendment - Deliberate Indifference for Continuing to House Plaintiff in Solitary, despite the psychological ongoing harm, Post-ADX.
Subclaim E - Violation of 8th Amendment - Housing Epileptic w/ inadequate care.

Claim Two: Subclaim A - Violation of First Amendment - The Transfer to ADX was Retaliatory;
Subclaim B - Violation of First Amendment - The Refusal To Transition Pinson out of ADX was Retaliatory;
Subclaim C - Violation of First Amendment - The Refusal, Post-ADX, to let Pinson out of Solitary Confinement is Retaliatory.

16

## V - Requested Relief

1 - Compensatory and Punitive Damages, in an amount to be proven at trial, awarded to plaintiff against defendants Samuels, Santana and Howard.

2. Declaratory Judgement stating (1) housing mentally ill prisoners in solitary confinement, or its equivalant, for long periods of time violates the Eighth Amendment (2) that such housing is harmful to the mental health of such persons (3) that plaintiff has been harmed mentally, emotionally and physically as a consequence of her isolation (4) that continuing to house plaintiff in solitary confinement would violate the 8th Amendment.

3. An Injunction (1) Ordering defendant BOP to redesignate Pinson out of solitary confinement housing/institutions (2) appoint a Special Master to oversee the administration of mental healthcare in the BOP to ensure its administered within the requirements of the 8th Amendment and community standards of care.

Executed under penalty of perjury pursuant to 28 USC 1746.

3/11/15
Date

Jeremy Pinson #16267064
PO Box 4000
Springfield MO 65801

17



U.S. District Court
1100 Commerce St. - Rm. 145
Dallas, TX, 75242-1310

RECEIVED
MAR 23 2015
C.C.

Legal Mail